FILED

2018 Mar-15  PM 04:15
U.S. DISTRICT COURT
N.D. OF ALABAMA



Troy T. Williams v. Equifax Information Services LLC. | 1
**Case No. 5:17-cv-01216-CLS** |

# EXHIBIT D:

## LEONARD BENNETT TESTIMONY AS IT PERTAINS TO EQUIFAX ANSWERS TO PLAINTIFF'S ADMISSIONS

Written Testimony

Before The

HOUSE COMMITTEE ON FINANCIAL SERVICES

Regarding

"Fair Credit Reporting Act: How it Functions for Consumers and the
Economy"

June 19, 2007

Submitted by: Leonard A. Bennett
Consumer Litigation Associates, P.C.
12515 Warwick Boulevard, Suite 100
Newport News, Virginia
(757) 930-3660
(757) 930-3662 (fax)
www.myfaircredit.com
www.consumerlawusa.com
email: lab@clalegal.com

on behalf of the
National Association of Consumer Advocates
1730 Rhode Island Ave., NW, Suite 710
Washington, DC 20036
202-452-1939
202-452-0099 (fax)
www.naca.net

Chairman Frank, Ranking Member Bachus and other distinguished members of the Financial Services Committee, the National Association of Consumer Advocates (NACA) thanks you for inviting us to testify today in this important hearing to consider the adequacy of the Accuracy and Reinvestigation protections of the Federal Fair Credit Reporting Act.

My name is Leonard A. Bennett. I have been asked to appear before you on behalf of NACA, a non-profit association of attorneys and consumer advocates committed to representing customers' interests. Our members are private attorneys, JAG officers from the various service branches, state attorneys general deputies and other public sector attorneys, legal services attorneys, law professors and law students whose primary focus is the protection and representation of consumers.

I am a consumer protection attorney. I have practiced law in Virginia since 1994 and in North Carolina since 1995. I have also been admitted to and litigated consumer cases in District Courts across the country. Over the last five years alone, I have spoken at numerous State Bar CLE programs, national Consumer Protection and FCRA conferences and seminars and have regularly taught the Army and Navy JAG school courses on FCRA, Identity Theft and Consumer Protection issues. More than anything else, my practice is devoted to the private enforcement of the FCRA. By most accounts, I have prosecuted more federal claims against Equifax, Trans Union and Experian, as well as many of the nation's largest credit data furnishers, than all but a few advocates. I have received published FCRA decisions from my cases and I have lost only four FCRA cases out of hundreds prosecuted. I have been asked to represent NACA today because of the industry knowledge I have gained by this focused litigation experience.

In most ways, this testimony is directly against my self-interest. Given the current state of affairs and industry non-compliance, our law firm has far more FCRA cases than we can handle. The public, and thus jury pools, are sympathetic. And business for me personally has never been better. If you fix these problems, I would be out of a practice. However, I was not asked to speak today in support of my own self-interest. Rather, I am charged by NACA to speak as a consumer advocate. The problems I discuss herein are not simply those of my retained clients. Instead, they are the difficulties and industry failures imposed on all consumers.

-2-

On each of you, on your staff and even more importantly, on your constituents, every one of which will have a credit file, many of which will be inaccurate.

You have received communications and testimony from the official spokespersons and government relations professionals for the industry. I do not profess to have the Washington experience, let alone political savvy of the CDIA attorney, Anne Fortney, or the CDIA lobbyist, Stuart Pratt, employed by Equifax, Trans Union and Experian. What I can offer that each of these alternate witnesses lack is real world knowledge. I have actually read the manuals and internal documents of the national reporting agencies and have taken the depositions of their employees and agents, from the lowest level outsource vendors to the highest officials and in-house attorneys. I have interviewed hundreds of consumers impacted and harmed by credit industry misconduct. In contrast, and with all due respect, I can offer all takers our transcript of the deposition of Anne Fortney, an attorney who represents the CDIA lobbyist team, and her concession that she had not read the subject investigation procedures. And I have already provided internal emails between Ms. Fortney, Mr. Pratt, and the top attorneys from the "Big 3" reporting agencies, in which the CDIA lobbyists acknowledged a lack of substantive knowledge of agency data and procedures.

## OVERVIEW

In 2003, I was invited to testify before the appropriate Financial Services subcommittee, then presided over by Representative Bachus. As I intend to do herein, I provided specific deposition testimony and live knowledge from FCRA litigation. At that time, I cautioned that we were heading to a point in the credit industry's evolution where it would be completely automated. Now, four years later, I can state without condition that we have arrived at that point. All important components of the credit reporting system are automated. What human involvement remains is solely that of data entry, much of it accomplished overseas. Anyone who tells you otherwise is not being truthful.

### *All Studies Show Significant Inaccuracy in Credit Reporting.*

The present credit reporting system is broken. Every analysis or study accomplished in this decade, including the FACTA authorized FTC Pilot Study has found inaccuracies in a significant percentage of the reports considered. Identify theft, very often a misdiagnosed "mixed file" problem, again puts credit reporting inaccuracies at the top of the list of Federal

-3-

Trade Commission complaints, 246,035 complaints in 2006 or 36% of the FTC total. The FTC actually estimates the total number of consumers affected by identity theft as in excess of 10 million. The credit reporting agencies receive a rising number of consumer disputes complaining of millions of inaccuracies in their credit reports. Remarkably, when consumers requested a free copy of their report after suffering a credit denial, 75% thereafter informed the bureaus that the report was inaccurate.[1] This Congress can see the failures in the system. Consumers are terrified about the potential impact of credit data leaks because of their correct perception of the ease of identity theft and the difficulty of correcting credit inaccuracies resulting there from. More dangerous for the economy is the fact that credit data has also become a far less effective predictor of future credit behavior. Bankruptcies again are rising. Mortgage and car loan defaults are heading out of control. The credit reporting industry, champions of automated credit decisioning and proponents of the predictive reliability of their credit data, cannot now argue that their systems and files have made the economy stronger, stable and more predictable.

### *National Consumer Reporting Agencies are Profiting from Inaccuracies.*

The credit reporting industry response to these problems has been shocking. Rather than increase resources and attention to develop solutions to these inaccuracy and identity theft problems, the national reporting agencies have cut their per capita resources for resolving consumer disputes at the same time they have rushed to maximize profits from same. For example, Equifax pays its outsource vendor in the Philippines between $.41 and $.57 to process each consumer dispute letter it receives. But through the agencies' E-Oscar system, they charge no less than $.25 from their creditor customers for each ACDV dispute form sent electronically. Thus, if a consumer disputes five inaccurate accounts after a file is mixed or an identity stolen, Equifax would pay its vendor a fraction of the gross amount (e.g. $1.25) it charges its creditor customers through E-Oscar. In fact, the more automated disputes it sends out, the more money it generates. It is this "revenue" opportunity that in 2005 caused the national reporting agencies to move the E-Oscar electronic system from their non-profit lobbying organization, the CDIA, to a new for-profit company, Online Data Exchange, L.L.C. I am restricted from offering any further details because of a CRA insisted Protective Order.

_____

[1]

The national CRAs have developed another new and even more substantial profit center based on consumer fear of inaccuracies in credit reports. Each agency markets a credit-monitoring product directly to consumers. For example, Experian has branded and marketed by large television buys its misnamed service www.freecreditreport.com. As the agency reported to its shareholders on May 23, 2007:

> Consumer Direct [*online credit reports, scores and monitoring Services*] delivered excellent growth throughout the period, with strong demand from consumers for credit monitoring services, which led to higher membership rates.

On its internet home page, www.equifax.com, Equifax sells its credit monitoring products to consumers stating: "Make sure your reports are accurate & free of fraud." In its most recent quarterly filing, the agency reported that its sale of these reports and its credit monitoring products directly to consumers had generated no less than 10% of its operating revenue and one sixth of its credit reporting revenue. Ironically, all three agencies market products with "identity theft" insurance to provide attorneys fees and expenses necessary to obtain the correction of their credit reports from those same agencies. Thus, consumers are faced with what can fairly be described as credit extortion. Consumers are told to buy the CRA products or else remain in fear that they will be inaccurate and full of fraud.

It bears noting that these problems and concerns may not face an identified celebrity, regulator or government official. Each of the Big 3 CRAs maintain a list of consumers they identify as "VIP" files.[2] Trans Union's employee witness testified:

> Q.    And some references have been made in prior cases to maybe a VIP category. Is there such a category? [. . .] For example, if a lawyer makes a dispute, its handled by your department?
> A.    That is correct.
> Q.    If a politician or [a person] known to be a politician makes a dispute, are those the types of disputes you might handle?
> A.    Yes.
> Q.    And celebrities as well?
> A.    Yes.[3]

These files, which also include CRA employees, for likely the obvious reasons receive special treatment. They are handled by high level employees. In fact, for Equifax and Trans Union, the

---

[2] The title "VIP" is not contrived for this testimony. It is the actual title to the status and is detailed in CRA manuals.

[3] Mullins v. Trans Union, et al. Deposition of Shontese Norwood, September 21, 2006.

-5-

remarkable difference is that they are handled by an agency employee actually located in the United States.

### *The Credit Reporting System is Concentrated in the Control of Three National CRAs*

There are three major national consumer reporting agencies – CRAs. Equifax publically traded and based in Atlanta. Trans Union privately held and based in Chicago. Experian, formerly TRW, British owned and publically traded with U.S. operations based in Costa Mesa, California. Over the last decade, the Big-3 agencies have consolidated data control and ownership by repurchasing their former affiliate territories. While reporting was largely regional years ago, it is now entirely national.[4]   The Big-3 long ago created the Associated Credit Bureaus (ACB), which in the early part of this decade changed its name to the Consumer Data Industry Association (CDIA). The CDIA claims a large membership total, but this is deceiving. I cannot share certain information because Equifax has bound me by a Protective Order from doing so. But the CDIA documents we have produced evidence almost total control by Equifax, Trans Union and Experian. Experian currently heads the Board of Directors. You can also review the CDIA email exchanges discussing its current testimony and observe the total control of the organization by the Big-3 agencies.

### *The METRO 2 Reporting Format is a Positive Development.*

Years back, the CRAs created a uniform reporting format, Metro. It had considerable limitations and has now been almost entirely replaced by the newer format, Metro 2. This is certainly the most important and economically important product of the CDIA. The Metro 2 format creates a means for creditors and collection agencies to organize and report their data in a consistent manner for each of the three agencies. No one can dispute its importance or success. The format was created by the "Metro Task Force" between the three agencies through the CDIA. It is documented by the Credit Reporting Resource Guide easily obtainable from the CDIA. Metro 2 reporting works like this: A creditor maintains its account records and historical data in its own unique database. It will then adopt a computer program, or hire an outside vendor, to convert that data on a monthly basis out of the creditor-specific format and into Metro 2 format. It will furnish to each CRA one line of Metro 2 code for each of its accounts. Every space in the Metro 2 code line will represent part of a specific field. For example, information

---

[4] A primary exception is CSC which technically "owns" Equifax's consumer files in certain states. Equifax and CSC have a complicated contractual relationship to divide up royalties and income when their businesses intersect.

placed in certain spaces will be interpreted as last name. Other spaces will be extracted by the CRAs as the social security number. Others will uniformly represent account number. In these monthly Metro 2 data dumps, the creditors will also report whether the account is current, or, if not, how late on payment (*e.g.* 30, 60, 90 days or more, Chargeoff, Foreclosure). The Metro 2 code line for an account will also indicate what the balance is on the account, what the minimum monthly payment is, and when the last payment was made. If the subscriber reports information incorrectly in the Metro 2 code line, it will be entered into each CRA's credit file incorrectly.

The Metro 2 format is remarkable because it allows, and we argue should require, subscribing creditors to furnish complete data on their accounts. However, as I discuss below, the CRAs treat most of their Metro 2 fields as creditor optional. Thus, though they have the contractual and procedural means to ensure complete data through Metro 2, they chose not to do so.

## CREDIT REPORTING INACCURACIES

### *Mixed Files.*

Many credit reporting inaccuracies are caused entirely by the CRAs. These are typically the "mixed file" cases and their related offshoot "identity theft." There are multiple causes of "ownership" inaccuracies in which a credit account or other item belonging to one person appears in the credit report of another. One of the ways this can occur, as discussed below, is through inaccurate reporting by a creditor. Another common explanation – mixed or merged files – is caused by the way reporting agencies match data to files.

Mixed or Mismerged files are now a frequent problem. One study found that 44% of consumer reporting complaints to the FTC involved mismerged files. Of these complaints, 64% had total strangers' files mixed in with the consumer's, while 36% involved information belonging to relatives or former spouses.[5] A study of credit scores for mortgage applicants by the Consumer Federation of America and the National Credit Reporting Association found that one in ten files (155 out of 1545) contained at least one, but as many as three additional repository consumer reports and that it was very common for the additional reports to contain a

---

[5] U.S. Public Interest Research Group, *Credit Bureaus: Public Enemy #1 at the FTC*, October 1993. In this sample, U.S. PIRG analyzed 140 complaints to the FTC.

-7-

mixture of credit information, some of which belonged to the subject of the report requested and some which did not.[6] Common reasons for the additional reports include:

- Confusion between generations with the same name (Jr., Sr., II, III, etc.).
- Mixed files with similar names, but different social security numbers.
- Mixed files with matching social security numbers, but different names.
- Mixed files that listed accounts recorded under the applicant's name, but with the social security number of the co-applicant.
- Name variations that appeared to contain transposed first and middle names.
- Files that appeared to track credit under the applicant's nickname.
- Spelling errors in the name.
- Transposing digits on the social security number.[7]

Mixed files are caused almost entirely by the aggressive matching procedures at each of

the national CRAs. When Metro 2 code lines are furnished to the CRAs in large monthly

batches, the CRAs uses an automated matching system using a mathematical algorithm that

integrates certain business rules determined by CRA policy. For example, the CRA will weight

certain identifying segments, such as first name and a 7 of 9 digit social security number match

heavily and will weight far less last name and even address. A substantive explanation of the

CRA matching process was provided in a 2005 deposition of Equifax's Vice President of

Technology:

> Q. And what is required to match a tradeline to an existing file?
>
> A. We use the L90 search logic, which has 13 matching elements, and based on those 13 matching elements, we have an internal algorithm that makes the determination whether the ID matches sufficiently to apply the trade.
>
> Q. If a first and last name and the full social security number on the tradeline match an existing file, would Equifax report that tradeline to the existing file?
>
> A. Yes, given there was not other information that was in conflict that prevented that, that kind of took away from the positive match of a name and a Social then, yes, I believe it would. I would like to see the specific example, though.
>
> Q. What if the current address is on the existing file and the new tradeline did not match?
>
> A. If the Social Security number matches, that's normally enough information to allow it to update, even if the address does not match.[8]

---

[6] Consumer Federation of America and National Credit Reporting Association, *Credit Score Accuracy and Implications for Consumers*, p.21, December 17, 2002, *available at* www.consumerfed.org/121702CFA_NCRA_Credit_Score_Report_Final.pdf.

[7] *Id.*

[8] Beck v. Equifax, et al, Deposition of Phylliss Dorman, August 1, 2005.

If the specific account meets a certain matching score threshold for an existing credit file, it will be added to that file. If there is not an existing file with an exact match to the account data, the CRA process will allow partial data matched accounts to be reported to a file. There may only be a file which matches some of the account id segments. These could include a partial matching name, for example John Watson and John Watts, or Jeff Franks and John Franks. Or the file match to the account may include only a partially matched address, such as 1200 First Avenue and 4516 S. First Landing Street. Typically, the closeness of the match between an account and an existing file is scored or scaled and then the account is placed in the credit file with the closest match. The closer the match to a file, the higher the correlation score. The FTC refers to this process as "file building."[9]

One of the greatest problems with a Mixed File is the CRA refusal to construct business rule barriers to prevent and resolve further credit inaccuracies that result. A Mixed File, for the same reasons true for Identity Theft, is like a virus. Most consumers do not understand what is happening and, without industry knowledge, have no idea how the problem spreads. Mixed Files occur because of some matching identifier, such as address, in the consumer's file. Until that identifying segment is corrected or suppressed, or unless the CRA manually edits the file, the mismerge will continue and likely become worse. For example, in Ms. Dugger's case, she devoted half a decade to recovering her credit after a combination mixed file/identity theft problem. Each time she was turned down for credit, she would request her credit report and dispute the accounts that were not hers. Each time, the CRAs would delete the disputed accounts. And each time new mixed accounts would appear. In litigation, we obtained the CRA internal documents and learned what was happening. The CRAs continued to mix my client's file with an out of state consumer with the same first and last name. The CRAs had inaccurately added the third party's middle initial to my client's file. Every time an account was reported with that middle initial, it was placed in my client's file. Another "virus" problem with mixed files is caused by the cross pollination between the CRAs and their subscribers. In the unrelated cases of Mr. Daniels and Mr. McCue, the respective CRA had added the inaccurately matched identifying segments (address) to my client's file. Before the consumer could dispute the

---

[9] FTC, Report to Congress Under Sections 318 and 319 of the Fair and Accurate Credit Transactions Act of 2003, at 9 (Dec. 2004).

incorrect address, it was provided by the CRA to one of the creditors of the respective similarly-named third party. Thereafter, those creditors reported through their own monthly Metro reporting to each CRA the inaccurate addresses they had obtained through the skip trace credit reports.

Mixed files are also a growing problem for attorneys who institute collection lawsuits and the often innocent consumers they unwittingly sue. One of the first steps a collection attorney will take when he receives an assigned file is to request a skip trace from one of the national CRAs. These reports are often the broadest matched files provided by the bureaus. It is now very common for the collection attorney to receive an incorrectly matched report and to thereafter sue the similarly named but wrong consumer. I suspect that the Committee can substantiate this growing problem by randomly choosing any attorney with an active collections practice. Similarly, consumer mortgage reports are often generated with a loose match algorithm. I thus also suspect that the Committee can substantiate this problem with an inquiry to a randomly selected realtor, mortgage broker or underwriter.

Most know by now of Mr. Carroll's difficulties in Massachusetts in which all three CRAs mixed his credit file. In fact, in preparation for this very hearing, the CDIA noted that Mr. Carroll's credit file still was not corrected. While brought to the Committee's attention by the Boston Globe, this "mixed file" problem, discussed below, is very common. In my 2003 testimony, I offered:

As common in my case portfolio are those claims we describe as "merged identity" cases. As easy as it is for an identity thief's credit files to be combined with that of an innocent consumer, it is even more likely to happen to persons of similar name and address or social security number. The credit reporting industry is now almost entirely automated. Its file searches do not require full identifying information -either to obtain a credit report or to furnish information to the bureau. As a result, I have been asked to help Sandra K. Brown, who had perfect credit, when Equifax could not keep the files of Sandra M. Brown from merging. And Mary E. Jones and Mary W. Jones, who because of their similar names and addresses had both of their identities combined by Trans Union. Or Teresa B. Davis, who lived on the same street as had Teresa G. Davis several years prior and had much better credit before Equifax merged the two files. These are my cases, solely out of Newport News and Hampton, Virginia. But, there is nothing about this problem which is unique to my community. It is happening everywhere throughout America. And while no one consumer is truly immune from it, the problem is much worse for consumers with common surnames, particularly those who share their name with multiple generations.

-10-

Now, in addition to the names of Mrs. Brown, Ms. Jones and Ms. Davis, we can add as well Mr. Carroll. Since 2003, the list of litigated mixed file cases has grown considerably. The National Consumer Law Center discussed a sampled few. The Committee can add to such examples Linda Johnson. In 2003, I discussed a then-pending Fourth Circuit appeal, Johnson v. MBNA. The case was decided favorably for consumers and was the subject of considerable industry reaction. It was considered by the FTC in its recent Reinvestigation Report. The Court of Appeals held that a FCRA investigation must be a "searching and meaningful inquiry" to determine the actual status of an account. Remarkably however, after spending several years litigating for the deletion of her ex-husband's account from her credit file, Linda Johnson came back to me for an entirely new matter. Equifax and Trans Union had merged Ms. Johnson's credit file with another Newport News woman with the same name. It took another year of litigation to again clear her good name.

More recently and more tragically is the case of Kenneth Baker. Mr. Baker had his financial life combined with that of a similarly named total stranger by all three CRAs. The bureaus placed tax liens and defaulted accounts on his credit file and made it impossible for him to move on and survive a difficult part of his life. Mr. Baker took his own life in 2006. The CRAs were mentioned prominently in Ken's final note to his surviving daughter who now fights for some principled justice.

Another troubling and common mixed file problem is when the CRAs combine a parent's credit file with that of a child, as with my client Mr. Payne, or one sibling's file with that of another, such as the pending case of Mr. Schubert. If two consumers have a similar name, even if not exact, and also share either an address or a social security number matching seven of nine digits, the CRAs will very often combine the two files. The CRAs make little accommodation for a son who at some point lived with his parents and shares his father's name (or a close proximity). They make even less for a consumer who received a social security number at the same SSA Office and within a proximate date range as their prodigal sibling. These cases are often the most difficult as they result in even greater division and animus between family members. Creditors and CRAs alike aggressively use the relationship as leverage to obtain payment from the otherwise innocent family member.

-11-

These examples are only but a small fraction of the total number of mixed file cases ongoing at any one time. We have represented countless other mixed file victims – to many to name - many incorrectly believing they were identity theft victims. These cases have been brought across the nation by various NACA members and the consumers they represent. We may well have represented one or more of your own constituents so victimized by a mixed file.

### *Identity Theft*

This sort of mismerging further aggravates the effects of identity theft. In fact, identity theft is a misnomer. The criminal actually steals from the creditor using only a partial set of a consumer's identifiers. In makes little sense for a criminal to apply for a credit card using the full name and address of the consumer victim. In most instances, beyond the less common mailbox theft, all that would accomplish is the opening of a new account available only to the innocent consumer when he receives the new card. The modern identity theft is accomplished by manipulating the use of some consumer identifiers and not others in a manner that takes advantage of the CRA's loose match policies. For example, the fraudster may use the consumer's first name, but add his own last name, use the consumer's social security number and add a new mailing address. If the consumer has not previously alerted the CRA to a fraud, the CRA will match the data to the consumer's file and provide to the new creditor for the benefit of the identity thief a credit report that will survive the application process. Accordingly, "identity theft" is really only an initial genesis of the problem. It is instead better understood as a form of a mixed file.

In this era with heightened media attention to the problem of identity theft, many consumers incorrectly presume that the appearance of an item which is not theirs is the product of criminal activity, fraud or identity theft. This is very often not the case. Instead, the CRA may simply have mismatched accounts of two otherwise innocent consumers.

Identity theft is made much easier by the CRA refusal to impose meaningful verification requirements on their customers. Often, the creditor requesting a credit report will provide far less information to obtain the report than the CRAs will require from a consumer making a dispute. When a creditor or potential creditor requests a consumer report, the Big 3 CRAs require very little information in the inquiry. The customer is not even required to provide the social security number of the applicant consumer. Some do not provide full names. The CRAs

-12-

will furnish a consumer report that is the closest match to whatever data the customer provides in the inquiry. One CRA, Equifax, will furnish every file that is a potential match.

Accordingly, while Congress, the FTC, and other Federal and State officials should continue to battle the criminal aspects of Identity Theft, the Committee must recognize that the mechanics of the problem are in significant part the fault of the national CRAs.

### *'Ownership' Disputes.*

Certainly not all inaccuracies originate with the reporting agencies. In fact, many will start upon the furnisher's reporting. Creditors often attribute their account to a consumer who does not owe the debt. Most frequently, the furnisher is incorrectly attributing the "ownership" of the account to a spouse or other authorized user who is not contractually liable. Other times, the consumer may have been the victim of an identity theft where a third party fraudulently opened an account for which the furnisher is now incorrectly attributing ownership. According to CRA statistics, these "ownership" disputes are the most common. The CRAs use the dispute code "Consumer states account is not his/hers" over 30% of the time.

To understand the context of these errors, you need to understand the objectives and motivations of creditors and collectors in the credit reporting system. Creditors and debt collectors report their accounts under contractual obligation to the CRAs and in order to ensure the collection and payment of their billed accounts. When I began the practice of law shortly after graduating law school in 1994, most unpaid or late debts were collected through dunning letters, phone calls and ultimately small claims collection suits. Today, this is much less often the case. The first means of collection is via credit reporting. [10] In fact, many debt collectors do not attempt collection by any other means. They often will report such debts to spouses. And in many such instances, this reporting is accomplished without any review of underlying account documents. [11]

A consumer's discovery that a creditor or collector is reporting the debt of another in his or her credit report is usually the start of a credit reporting ordeal. Sometimes the reported debt is recognized as belonging to a relative or spouse. Some creditor's such as credit card giants MBNA, now merged with Bank of America, and Capital One are renowned for their deliberate

---

[10] Rivera v. Bank One, 145 F.R.D. 614, 623 (D.P.R. 1993) (a creditor's report of a credit card debt to a CRA is a "powerful tool designed, in part, to wrench compliance with payment terms from its cardholder")

[11] Another new means of modern collection is often the initiation of distant "arbitration" proceedings to which consumers rarely respond, another important issue not now before this Committee.

-13-

reporting of accounts to an authorized user spouse. The problem is that many large creditors deliberately destroy or do not retain the underlying account records to support their account reporting. For example, in a 2006 case more recent than the also on-point 2004 Fourth Circuit decision in <u>Linda Johnson v. MBNA</u>, a District Court in North Carolina considered the common proposition in the credit industry that a creditor may report a debt even if it could not otherwise establish its validity. In the somewhat similarly named, but unrelated, <u>Sara Johnson v. MBNA</u> case, the Court explained (and rejected) this industry argument:

> MBNA says its inability to produce a signed application indicating that Plaintiff opened the account is "irrelevant." According to MBNA, it is obligated to retain such records for only two years, pursuant to 12 C.F.R. § 226.25(a) (2005) (Truth in Lending, Regulation Z). (MBNA's Reply Mem. at 5.) However, Section 226.25 concerns only those records which constitute "evidence of compliance" with Regulation Z and states that the two years begin to run "after the date disclosures are required to be made or action is required to be taken." Thus, it may not apply in this case at all. Moreover, MBNA has not produced any records to support its assertion that Plaintiff is a joint obligor on the account, such as the original application, Plaintiff's signature for purchases made with the card, her involvement with or use of the cash withdrawn on the account, or payments on the account made by Plaintiff. Instead, MBNA relies on computerized notations that are inconclusive[.] . . . It is axiomatic that a bank must have more than a person's name on the account statement to establish liability. The court cannot accept MBNA's assertion that Section 226.25 absolves it of an obligation to produce any proof of Plaintiff's liability on the account. *Accord* <u>Linda Johnson v. MBNA Am. Bank, N.A.</u>, 357 F.3d 426, 432 (4 Cir.2004) ("jury could reasonably conclude that if ... MBNA no longer had the application, they could have at least informed the credit reporting agencies that MBNA could not conclusively verify that Johnson was a co-obligor")[.].[12]

Over the last decade, debt collection tactics have changed. Particularly with the massive identity theft problem, proving in a small claims court that a consumer is liability by a "preponderance of the evidence" has become unnecessary. The *de facto* burden of proof has shifted and now consumers are forced to prove the negative – to disprove their obligation on a debt. Failing their ability to do so, the creditor or collector will continue to report the consumer's responsibility. In fact, in our litigation of the <u>Linda Johnson v. MBNA</u> case, we learned from MBNA's account records that the consumer was expressly told, "It is not our burden to prove you owe the debt. It's your burden to prove you do not."

---

[12] <u>Johnson v. MBNA America Bank Nat'l. Ass'n,</u> 2006 WL 618077, n.7 (M.D.N.C. 2006).

Several years ago, the FTC took a rare enforcement action under the FCRA against a debt collector who had espoused the same arguments now so dominating the credit industry.[13] The debt collector was reporting debts to consumer credit files without any attempt to verify same through actual account records. The FTC was successful in obtaining the reporting collector's compliance through a consent order requiring reporting after dispute only when the collector had reviewed the actual underlying account records. This was the only FTC enforcement action of its kind. If the Commission were to more vigorously enforce these same standards today, it could dramatically reduce this type of inaccurate reporting.

### Credit Limits and Other Incomplete Reporting.

Many credit reporting errors occur because the furnisher has not complied with industry reporting standards, such as METRO 2, and the CRAs have not enforced the requirements of these standards. I will address three examples of such problems.

#### Withholding Credit Limits and Account Data.

Inaccuracy and incompleteness occurs when lenders intentionally withhold positive payment histories or reporting data from the credit reporting agencies for accounts they otherwise report. Mortgage lenders and credit card issuers often do so for strategic reasons. Their asserted objective is to shield their customers from competing lenders who might otherwise solicit them. This practice, which is especially common among subprime lenders, results in credit reports that do not accurately reflect the positive payment histories for borrowers, especially high-interest borrowers in the subprime market.[14] The Comptroller of the Currency suggested that legislation may be required in order to ensure that such information is reported and consumers are protected from such incomplete reporting.[15] Currently, one large credit card lender, Capital One, refuses to report the credit limits for their customer accounts.[16] Recently another, possibly Citibank, appears ready to cease reporting its limits. One of the most heavily weighted parts of a credit score is "credit utilization" which measures the proportion of a

---

[13] United States of America v. Performance Capital Management

[14] Federal Trade Commission, Report to Congress Under Sections 318 and 319 of the Fair and Accurate Credit Transactions Act of 2003, December 2004, p. 12.

[15] Office of the Comptroller of the Currency, *Press Release NR99-51*, June 6, 1999, *available at* www.occ.treas.gov/ftp/release/99-51.wpw.

[16] Federal Trade Commission, Report to Congress Under Sections 318 and 319 of the Fair and Accurate Credit Transactions Act of 2003, December 2004, p. 12-13.

consumer's total revolving credit which is then being used.[17] When a credit card company does not report its customer's credit limit, the reporting agencies substitute the historical value for the highest amount of credit ever used on the account. This can negatively impact a consumer's credit score. This inaccuracy is difficult to diagnose as the consumer will not receive a paper credit report which lists the high credit value in the credit limit field. Instead, the agency computers essentially publish two different reports – one that then enters the scoring algorithm and the one which is printed in narrative form and shown to the consumer. As there are approximately 50 million outstanding Capital One accounts, the number of consumers affected is certainly in the tens of millions.

In considering this issue in its report, the FTC absolved the CRAs from responsibility for these problems upon the assertion from the CDIA that respective creditors may simply forgo the use of their credit reporting services if the CRAs demanded credit limit data. It is unbelievable that the CRA claim that Capital One would cease using national credit reports received any attention let alone was taken seriously by the FTC.

**Post-Bankruptcy Discharge Reporting.**

One of the most prevalent credit reporting problems over the last several years is the failure of the reporting system to provide consumers a "fresh start" after a bankruptcy discharge. Creditors frequently fail to report an updated status for discharged accounts or continue to report their pre-discharge status and balance. Reporting agencies do not update tradelines and judgments they otherwise know have been discharged. My office has represented at least a dozen consumers who were forced to file federal lawsuits to obtain the correction of their credit reports. We are also currently involved in a national case in California targeting the same inaccuracies. Across the country there are scores if not hundreds of such claims active in various stages of federal litigation.

Under the METRO 2 reporting format, a bankruptcy discharge is an account "condition" reported for each consumer who filed. The effect of a bankruptcy on a consumer's credit score is of course initially devastating. However, it is a static event and, all other things equal, a consumer's credit score will continue to improve each day that passes post-discharge.[18]

---

[17] http://www.myfico.com/CreditEducation/WhatsInYourScore.aspx.
[18] See e.g. http://moneycentral.msn.com/content/Banking/bankruptcyguide/P108797.asp.

-16-

Post-bankruptcy inaccuracies are caused by both furnishers and reporting agencies. A very significant number of creditors never report a pre-Bankruptcy Petition tradeline or collection account as discharged or "included in bankruptcy." Often, when a creditor receives notice of a bankruptcy filing, it simply re-codes its internal account record to reflect the discharge and to avoid violating the bankruptcy stay. This may result in the account never again being reported to the credit bureaus. However, because the CRAs are accustomed to receiving only partial account information or histories, they continue to report the last known status and balance. For example, assume a lender reports a debt as 120 days late on December 31. On January 1, it receives notice of the bankruptcy and internally closes the account. Unless that creditor then re-reports with the new discharge status, the last reported information will be the pre-bankruptcy 120 days late.

Alternatively, some creditors may continue to report or report anew after the consumer's debts have been discharged. The reporting of a discharged debt as outstanding or owing is often accomplished by creditors to continue collection of an otherwise unenforceable debt. A United States Bankruptcy Court cautioned, "Such a notation on a credit report is, in fact, just the type of creditor shenanigans intended to be prohibited by the automatic stay."[19]

**Collection and Transferred Accounts**.

An ongoing problem for the reporting of collection accounts is the date of status or delinquency. Many collectors "re-age" their accounts to report them as more recent than is accurate. This problem is common and frequent. Consumer debtors remain burdened with a serious derogatory account status far longer than the seven years the law would provide. This is especially unjust when the CRA continues to report a "paid" collection or "paid" chargeoff.

Similarly, many collection accounts or credit accounts transferred between creditors are reported without reference to the original creditor or account. In fact, many credit card furnishers such as Capital One and MBNA, now Bank of America, will report an account under a new account number after receiving a consumer's dispute. Debt collectors will add a new collection account that often contains no indication that it duplicates an existing tradeline. These changes and omissions circumvent corrections and blocks placed in a consumer's file by the CRA after a dispute.

---

[19] Matter of Sommersdorf, 139 B.R. 700 (Bkrtcy.S.D. Ohio 1991).

All of these above-described problems would not occur if the CRAs did not accept accounts reported without all of the fields required by Metro 2.[20]

## CRA PROCEDURES ARE INADEQUATE FOR HANDLING CONSUMER DISPUTES.

The intended scheme of the FCRA was one in which a consumer reporting agency could presume its information inaccurate until otherwise put on notice. However, when a consumer notified it of a dispute, the balance was to shift and the agency could not thereafter rely blindly on its creditor customer. Unfortunately, this statutory intent is now systemically ignored by the national reporting agencies.

The consumer's right to dispute information contained in a consumer report is an important safeguard necessary to ensure accuracy.[21] The legislative history rightly characterizes the dispute and correction process as "the heart of ... efforts to ensure the ultimate accuracy of consumer report."[22] The original intent of the FCRA's reinvestigation requirements and their societal importance were plainly stated by Senator Proxmire when the Act was first introduced in the Senate:

It would be unrealistic to expect credit reporting agencies to be absolutely correct on every single case. But it seems to me that consumers affected by an adverse rating do have a right to present their side of the story and to have inaccurate information expunged from their file. Considering the growing importance of credit in our economy, the right to fair credit reporting is becoming more and more essential. We certainly would not tolerate a Government agency depriving a citizen of his livelihood or freedom on the basis of unsubstantiated gossip without an opportunity to present his case. And yet this is entirely possible on the part of a credit reporting agency.

115 Cong. Rec. 2412 (1969).

Despite the acknowledged importance of the FCRA reinvestigation procedures, the current dispute process is not reliably effective. One study found that ninety-four percent of consumer complaints concerning consumer reporting involved uncorrected errors in reports, and the average consumer had already contacted the CRA over three times--and waited without results for averages of between twenty-three to thirty-one weeks--before complaining to the FTC.[23]

---

[20] In fact, in order to accommodate Capital One, the CRAs actually changed the designation of the "credit limit" field in the Metro 2 Manual from mandatory to optional.

[21] In re: Equifax, Inc., 96 F.T.C. 1045, 1065 (1980), *rev'd in part on other grounds*, 678 F.2d 1047 (11th Cir. 1982).

[22] Committee Report accompanying S.650, S. Rep. No. 185, 104th Cong. 1st Sess., at 43 (Dec. 14, 1995).

[23] U.S. Public Interest Research Group, Credit Bureaus: Public Enemy #1 at the FTC (Oct. 1993).

***The FCRA Requires a CRA to Conduct a Meaningful and Independent Investigation.***

Restated, with superfluous text removed, Section 611(a) of the FCRA (15 U.S.C.

§1681i(a)) imposes on a CRA upon receipt of a consumer's dispute the following duties:

> [T]he agency shall conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file. §611(a)(2)(A).
> The notice [that the CRA provides to the creditor/furnisher after receiving the consumer's dispute] shall include all relevant information regarding the dispute that the agency has received from the consumer. §611(a)(2)(A).
> The consumer reporting agency shall review and consider all relevant information submitted by the consumer. §611(a)(4).
> [The CRA must immediately remove disputed information if it determines that] the information that is the subject of the reinvestigation is […] inaccurate or incomplete or […] cannot be verified. §§611(a)(2)(C) and 611(a)(5).

As written and applied, the FCRA reinvestigation section would seem unambiguous. If a consumer disputes the accuracy of information in a consumer report, the CRA must conduct an investigation. The investigation is called a reinvestigation, presumably because the CRA initially added to its files the item of disputed information only after employing reasonable procedures to ensure maximum possible accuracy in the first place. Before the 2003 FACTA amendments to the FCRA, the Act did not expressly define a qualitative standard by which the CRA must reinvestigate. The FACTA amendments clarified that the reinvestigation must be "reasonable."[24] This addition was consistent with judicial interpretations of the pre-amendment provision.

Underlying the "reasonableness" of a CRA's compliance with its FCRA "accuracy" duties is a two step balancing test used expressly or implicitly by nearly every court to apply the statute. The balancing test was formulated in 1994 by the Seventh Circuit in *Henson v. CSC Credit Services*:

> Whether the credit reporting agency has a duty to go beyond the original source will depend, in part, on whether the consumer has alerted the reporting agency to the possibility that the source may be unreliable or the reporting agency itself knows or should know that the source is unreliable. The credit reporting agency's duty will also depend on the cost of verifying the accuracy of the source versus the possible harm inaccurately reported information may cause the consumer.[25]

---

[24] 15 U.S.C. § 1681i(a), *amended by* Pub. L. No. 108-159, § 317 (2003); 16 C.F.R. § 602.1(c)(3)(xviii).
[25] 29 F.3d 280 (7th Cir. 1994).

These two factors--the degree to which the CRA has been alerted as to the unreliability of the information furnisher and the cost of verifying the inaccuracy against its possible harm to the consumer--provide the framework for nearly all judicial analysis applying the CRA's accuracy obligation, and especially interpretations of the FCRA's reinvestigation provisions. A CRA may be entitled to initially rely on an information furnisher because of the inordinate costs in independently verifying a nearly infinite pool of data.[26] However, when a consumer makes a dispute to the CRA, the reasonableness of the CRA's conduct is measured against a heightened standard and the burden shifts to the CRA.[27]

Despite the lack of any statutory ambiguity, each of the national CRAs, Equifax, Trans Union and Experian, are not merely careless with their reinvestigation compliance duties. They entirely ignore them. We recognize that the Committee will hear divergent positions from opposite parties in most of its deliberations. But trust that none of the claims stated herein are without factual support.

### The CRAs *Never* Conduct a 'Reinvestigation' and *Always* 'Parrot' their Creditor-customers.

The most critical provisions in §611(a) are the mandate that a CRA conduct a "reasonable reinvestigation" and the requirement that the CRA "review and consider" the information provided by the consumer. These provisions impose on a CRA the obligation to exercise independent discretion to evaluate the validity of a consumer's dispute. The leading case considering the qualitative standard for a reinvestigation is Cushman v. Trans Union. The Third Circuit stated in this 1997 decision:

The "grave responsibilit[y]" imposed by [§611(a)] must consist of something more than merely parroting information received from other sources. Therefore, a "reinvestigation" that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute. (emphasis added).

When confronted with this decision in litigation, CRA attorneys uniformly make two responses. First, they routinely claim that Congress implicitly repealed the requirement of an independent investigation when it added the FCRA's furnisher liability section in 1996. Secondly, they assert that their procedures do not defer entirely to the creditor and constitute something more than mere "parroting" of their customer's response.

---

[26] Henson v. CSC Credit Servs., 29 F.3d 280 (7th Cir. 1994).
[27] Cushman v. Trans Union Corp., 115 F.3d 220 (3d Cir. 1997).

-20-

While the first argument seems inconsistent with the statutory text and is more likely to be heard outside the spotlight of this Committee, the CDIA and its CRA directors will assert as they did to the FTC that their procedures involve an independent review and the exercise of discretion. Nothing could be further from the truth. If an industry representative makes such an assertion, the Committee should challenge same and demand a factual rebuttal to the following.

The three major nationwide CRAs all of their tradeline or creditor/collection disputes through an electronic dispute processing system, known as e-OSCAR (Online Solution for Complete and Accurate Reporting). E-OSCAR is owned by Online Data Exchange, L.L.C, a for-profit joint venture with owner ship divided equally amongst the Big-3 CRAs, plus a fourth CRA, Innovis. E-OSCAR is web-based and permits furnishers to communicate with the CRA over the Internet. These communications utilize standard forms with codes, Automated Consumer Dispute Verification forms (ACDVs)and Automated Uniform Data Forms (AUDFs). The CRA initiates a request for a reinvestigation with the furnisher by sending an ACDV through e-OSCAR.

The ACDV contains identifying information about the consumer in the CRA's file; one or two codes summarizing the consumer's dispute; and, if the CRA deems it necessary, a one-line free-form narrative field that supplements the dispute codes. This free-form field is sometimes referred to as the "FCRA Relevant Information field," but is rarely used. The CRAs' procedures manuals offer almost no instructions for their ACDV clerks as to what information should be placed in this one-line text field. As a result, the field is often left blank.

ACDV clerks at the CRA select a specific dispute code from among twenty-six offered by the e-OSCAR system, such as "Not his/hers" and "Claims account closed." These codes are often contained in a dropdown "pick list" and the criteria for selecting the appropriate pick list value for a certain dispute is often more specifically detailed in the procedures manuals.

The CRAs encourage consumers to submit disputes using a limited set of dispute codes, either contained in a pre-created dispute form enclosed with every consumer disclosure, or, more recently, by having the consumer submit a dispute over the Internet using a list of on-line check-boxes to select the basis for the dispute. When such a dispute is submitted over the Internet, there is usually no involvement of the CRA's personnel in the dispute process. The check-box selected by the consumer as most applicable to the dispute is matched to one of the pick-list

-21-

ACDV dispute codes and automatically sent to the furnisher without any human intervention. Likewise, regardless of whether the dispute is submitted on-line, via mail, or via telephone, the furnisher's response to the ACDV typically is automatically applied to the tradeline in question with minimal human intervention.

Of the three national CRAs, only Experian processes consumer disputes domestically. TransUnion receives disputes at its consumer relations facility near Philadelphia, scans the dispute into an electronic image and then transmits the image to Intelenet, its subcontractor located in Mumbai, India. Intelenet in Mumbai can connect directly to TransUnion's massive CRONUS database, retrieve a consumer's credit file and initiate the ACDV exchange. If a dispute falls into a certain category which requires "priority processing," such as when a consumer has a mortgage application pending, or the consumer falls with the VIP designation (e.g., a judge, attorney, or celebrity), Intelenet resends the electronic document back to the United States, where a TransUnion employee processes the dispute, albeit using the same CRA procedures manual that the Intelenet employees are contractually obligated to follow at the Mumbai facility. In either scenario, the furnisher's response to the ACDV is automatically reflected in the TransUnion database with no further interaction required and a letter confirming the results of the exchange is then mailed to the consumer.

Equifax maintains a similar dispute processing mechanism. The Equifax business rules require that the consumer's dispute is imaged by Innasource, based in Atlanta. A record of the dispute is logged into the consumer's file, and the dispute is then electronically transmitted to Jamaica, the Philippines, or Costa Rica. The foreign contractor accesses Equifax's database, retrieves the consumer's credit file and initiates the ACDV exchange as applicable. The results of the ACDV exchange are then auto-populated back into the tradelines.

None of these procedures attempt anything other than forwarding the coded "ACDV" to the respective creditor. In a March 2007 deposition, Equifax's Vice President described its entire "reinvestigation" process accordingly:

Q    What knowledge do you have as to the mechanics of how a DDC Filipino employee would process an Equifax dispute? [. . .]
A    The electronic image would be displayed on their screen. They would have an ACIS [Automated Consumer Interview System] screen that they would use. They would then look at the electronic image. They would they would read off the identifying information, enter [. . .] that ID information into the system, access that credit report. At

-22-

that point, they'd be able to determine if they were looking at the correct file.  If they were, they'd go further.  They'd read the read the letter, they gain an understanding of the issues at hand, and they'd look at the credit report to see if the credit report at that time reflects that.  If it does, they would send those particular items from the data furnisher or furnishers.  They would request that an investigation be started.

Q   Through the ACDV?

A   Through ACIS, the Automated Consumer Interview System.

Q   Okay.  And then [. . .] they would check a claim code and fill in the relevant information box from the dispute letter?

A   Correct.

Q   And then the ACIS system, Equifax's own system, would then generate an ACDV out of that?

A   Correct.

Q   And then that is sent by automated means through e-OSCAR?

A   Correct.

Q   And that outsourced vendor's employee's job for that dispute is now finished?

A   Assuming they've addressed everything on the --

Q   Right.  But they're not -- they're not going to handle whatever response the creditor may provide?

A   That's correct.

Q   <u>Do DDC employees have telephones on their desk?</u>

A   <u>I do not believe so.</u>

Q   As part of their compliance with Equifax's procedures, <u>do DDC's employees telephone consumers as part of conducting a reinvestigation?</u>

A   <u>They do not.</u>

Q   <u>Do they telephone creditors, the furnishers, as part of conducting a reinvestigation?</u>

A   <u>They do not.</u>

Q   Do they telephone anybody from outside DDC or Equifax as part of conducting a reinvestigation of a consumer dispute?

A   They do not.

Q   <u>What about e-mailing any of those non-Equifax, non-DDC people, creditor, consumer, or third party?</u>

A   <u>They should not be -- they do not e-mail them.</u>

Q   And what about fax machines?

A   [. . .} <u>They do not have fax machines either</u>.

Q   Under what circumstances will a DDC employee forward the consumer's actual dispute letter or documents the consumer provided to the furnisher, the creditor, as part of a reinvestigation?

A   A <u>mechanism does not exist to forward the actual documents</u>.

This is the same exact process used by each CRA.  The only human intervention is to determine the appropriate two-digit code to enter in a computer message to the creditor.  No independent discretion is exercised.  No information is "considered" in the reinvestigation.  The CRA agents

act only as data entry clerks to transfer the consumer's written dispute, of whatever detail, into one of the four primary dispute codes used over 90% of the time.

Each CRA has named its dispute processing manual by a unique name. I am endeavoring to provide Chairman Frank's office and the FTC the most recent complete and unprotected manuals I have in my possession. The pages I cite herein are also attached as an exhibit to this testimony. Experian's "Consumer Investigation Procedures Participant Guide" is the 2002 edition. Equifax's "Indicating Manual" is dated 2004 and Trans Union's "CRS Manual" is also dated 2004. While I have received and read the more recent CRA manuals, I am unable to share them as I remain bound by Protective Orders and CRA designations of such documents as confidential. If the Committee can obtain the agreement of the respective CRAs to release us from their designations, I will promptly provide the most recent manuals. Regardless, as is evident from the recent deposition testimony cited herein, the CRA procedures have not meaningfully changed. If anything, they have become more automated as the agencies have shifted all disputes to the E-Oscar ACDV system. Most of the details in these manuals relate only to how a CRA employee or outsource vendor is instructed to select appropriate dispute codes to send to the creditor. The descriptions of the other aspects of this 'reinvestigation' process are much shorter. For example, Experian lists four steps:

1. The consumer contacts Experian by phone, mail or the internet to request an investigation.
2. Experian notifies the creditor or public records vendor, via a Consumer Dispute Verification (CDV) form or an Automated Consumer Dispute Verification (ACDV) form of the consumer's investigation request.
3. The credit grantor checks their files or the public record vendor revisits the court to confirm or deny the consumer's claim. The A/CDV is returned to Experian with a response.
4. Experian sends the consumer, by mail, a Consumer Disclosure Final (CDF) with the creditor's or vendor's response.[28]

Trans Union's manual extends the Consumer Dispute steps to six and over four pages of its manual explains in relevant part:

1. Identify the Line item. ("[I]dentify the tradeline.")
2. Open the Disputes Screen.
3. Add Claim Code(s). ("Based on the information the consumer provides, select a Claim Code from the Claims drop-down list and chose Add.")

---

[28] Experian Consumer Investigation Procedures Participant Guide, 2002, p.7.

4. Add Consumer Comment. ("Add a Consumer Comment if the consumer provides additional details about the dispute that is not addressed by the current Claim Codes.")
5. Select an Address. ("If the subscriber/data furnisher has more than one address. . . The CDV will be sent to the displayed address.")
6. Finish opening the Dispute. ("Choose 'Done.")[29]

What is of course missing from these procedures is the exercise of any discretion. The CRAs defer entirely to, or "parrot" their creditor-customers. If the creditor instructs the CRA to retain the information as reported, there is literally nothing the consumer can do to override that instruction. While the CRAs offer the claim that they will review the documents the consumer provides to determine if they are "acceptable" to allow a correction outside the ACDV process, the word "Acceptable" is a proper name for a specific category of documents listed in the CRA manuals. Essentially, for a consumer's dispute of a credit account tradeline, the only "Acceptable" documents are written letterhead communications from the creditor itself instructing the CRA to delete or correct the reported tradeline.[30] Further, the creditor letter would have to be more recent than the last date the creditor had otherwise "verified" the account.

In explaining the real world application of these procedures, Trans Union's employee who performed such dispute processing before such tasks were shipped to India explained:

Q. [If the] consumer says, 'I dispute this credit card account, here's the account number, it belongs to my husband, not to me, what would you have done if you were complying with Trans Union's procedures in August '05?
A. I would dispute the account with the appropriate clam code.
Q. How would you do that?
A. In the computer. [. . .] I would click on the account and select the appropriate claim code. Once you hit okay, it says open, which means the dispute on that account has been opened.
Q. After you put the dispute code and click on the dispute, do you have any other role in the investigation or dispute process for that account?
A. No.
Q. It just gets sent onto the creditor, and your job as to that dispute is done, right?
A. Correct.
Q. It would be fair to say that if you were complying with Trans Union's policies, you're not as an investigator or as a dispute processor making any judgment calls or exercising any discretion about whether a consumer really owns the account? [. . .] You're not exercising that discretion?
A. No. [. . .]
Q. How does Trans Union instruct its employees to process the dispute?

[29] Trans Union CRS Manual, September 28, 2004, "Consumer Disputes", pp. 1-4.
[30] Trans Union CRS Manual, September 28, 2004, "Documents Acceptable for Maintenance", pp.1-4.

-25-

A.      In the system.

Q.      By taking the consumer's dispute, summarizing it into a claim or dispute code, inputting that into the system and sending that code to the creditor?

A.      Correct.

Q.      Is there any other part of an investigation besides that that Trans Union has instructed its employees is required?

A.      No.

Q.      What if the creditor and the consumer strongly disagree about whether a debt is owed, consumer says that the debt's now owed, the creditor says yes, it is, what does Trans Union do to determine who's correct?

A.      It's up to the creditor to make the decision.[31]

Experian's procedures are no more rigorous. Its employee testified:

Q.      After you receive a dispute such as Exhibit 1[a multipage dispute letter with nearly 60 pages of supporting documentation], if you were following Experian's mandate or requirement, you would plug the information into the computer, the name, address and social, and pull up the file on the screen, correct?

A.      Yes.

Q.      You would then review to learn what items were being disputed, is that correct?

A.      Yes.

Q.      What is the next step that you would follow if you were obeying Experian?

A.      I would process the items. [. . .] I highlight on the [tradeline] item, and I enter the option. [. . .]

Q.      What options do you have to choose from?

A.      I would choose the one 'the consumer states the item is not theirs due to fraud.'

Q.      So there is a list of multiple choice options that you would click on?

A.      Yes. [. . .]

Q.      And can you list some of the other multiple choice codes you could click on?

A.      [After estimating that there were as many as 15 dispute codes] There's one for 'not mine, for mixed file.'[32]

None of the CRAs follow procedures to consider and exercise discretion over a consumer's dispute, even if it arose from fraud or identity theft. When another CRA witness was asked, "What does Experian intend for its employees to do in order for them to obtain and review copies of the underlying documents on the dispute – from the creditor on the disputed account?, the employee testified, "It's not Experian's policy to require or suggest that its agent ask for any underlying documents. Experian doesn't train its employees to do handwriting analysis or

---

[31] <u>Mullins v. Trans Union, et al</u>, Deposition of Selena Bazemore, September 21, 2006.
[32] <u>Beck v. Experian, et al</u>, Deposition of Brenda Hahlen, June 29, 2005.

various other investigative-type things that would be required of reviewing a credit application."[33]

### *CRA Procedures Twist the Meaning of "Accuracy".*

The CRAs also now contend that their credit reporting is "accurate' so long as it matches the data provided by their creditor customers. This is plainly contrary to prior judicial and FTC interpretations of the "accuracy" duty. A reinvestigation must be a good faith effort to determine the accuracy of the disputed item.[34] More is usually required than simply confirming that the disputed information was in fact reported as it was received from the original source. However, this is all that the CRAs do. A recent CRA witness testified:

Q.     And how would they [Trans Union's employees] determine if the information is reported incorrectly?
A.     Well, its not – it's to make sure that it's in the right field, the right code.
Q.     Its not to determine –
A.     It's mot to say the balance is correct on so and so's account, no.
Q.     It's not to make sure that the underlying account data is accurate, right?
A.     I don't believe it is, no.[35]

### *The CRAs Do Not Forward "All Relevant Information".*

Another requirement for a FCRA reinvestigation is that the CRA forward to the creditor furnisher "all relevant information" provided by the consumer. This is a critical and ongoing battle between consumers and the national CRAs. In fact, as is apparent from the CDIA emails, this was also a matter in contention between the FTC and the CRAs. The consumer's Catch-22 is as follows: If a dispute is made directly to the creditor, it is rarely taken seriously as there is no private remedy for a creditor's failure to comply with Section 623(a) (15 U.S.C. §1681s-29a)). Furthermore, the FTC has initiated only a single enforcement action against a furnisher since the 1996 amendments. However, when a consumer makes a dispute to the CRA, required to trigger the furnisher investigation provisions under Section 623(b), the CRA will reduce the dispute, no matter how detailed, substantive or documented, to an ACDV electronic message with one of a handful of dispute codes. Clearly, a CRA's refusal to forward all relevant documents and details of the dispute appears to violate the statute. The CRA response is to rely on a field in the ACDV

---

[33] Beck v. Experian, et al, Deposition of Kimberly Hughes, June 30, 2005.
[34] Curtis v. Trans Union, L.L.C., 2002 WL 31748838 (N.D. Ill. Dec. 9, 2002); FTC Official Staff Commentary § 611 item 2.
[35] Mullins v. Tran Union, et al, Deposition of Eileen Little, September 21, 2006.

form that permits a "free text" comment by the CRA employee or agent. This box is limited to one line and a fixed number of characters. If you attempt an internet dispute and enter details in the free form box provided, you can see firsthand how limited this option really is. In addition, only a minority of ACDV's sent actually contain such a field. Trans Union's employee has testified that it is used less than 10% of the time and even then only if the consumer's dispute is not in a regularly selected category.[36]

What makes matters worse is the CRA collapse of the reinvestigation dispute codes from 100 choices under the old system, to 26 under E-Oscar. And of these twenty six choices, the CRAs use the same four codes for nearly 90% of all disputes, a fact the CDIA emails evidence they sought to conceal from the FTC. The percentage breakdown for the CRAs minimum number of codes is as follows:

| | |
|---|---|
| Not his/hers | 30.5% |
| Disputes present/previous Account Status/History | 21.2% |
| Claims Inaccurate Information.  Did not provide specific dispute | 16.8% |
| Disputes amounts. | 8.8% |
| Claims account closed by consumer. | 7.0% |

As the CRA testimony cited above evidences, there is no mechanism in E-Oscar, used now for 100% of all creditor tradeline disputes, by which the CRA agent can or will forward documents to the furnisher or receive documents from the furnisher. Any claim to the contrary is not truthful. Trans Union's witness testified:

Q.     But, again, there is no mechanism at all of which you're aware by which the dispute investigator would send copies of the dispute or documents with the dispute onto the creditor?
A.     No.[37]

In fact, other than the unusual and rare "VIP" disputes handled by the CRA attorneys or legal support, there is never even human contact between the CRA and the creditor source.

This "all relevant information" problem has a real and significant impact on consumers. Often, it strips them of their rights to force the creditor to conduct the very investigation to which the CRA wants to defer. Several Federal Courts have dismissed consumer claims against

---

[36] *Id.*.
[37] *Id.*

furnishers because of the generality of the CRA ACDV and its failure to forward the actual dispute and documents.[38]  The Seventh Circuit explained:

> Credit Control's investigation in this case was reasonable given the scant information it received regarding the nature of Westra's dispute. Credit Control received a CDV from Trans Union indicating that Westra was disputing the charge on the basis that the account did not belong to him. The CDV did not provide any information about possible fraud or identity theft or include any of the documentation provided to Trans Union by Westra. Credit Control verified Westra's name, address, and date of birth and sent the CDV back to Trans Union. Had Trans Union given Credit Control notice that the nature of the dispute concerned fraud, then perhaps a more thorough investigation would have been warranted.[39]

Similarly, in Malm, the Minnesota District Court held:

> While specific notice of Plaintiff's concerns could have compelled Sherman to conduct a more thorough review, thus creating an issue of "reasonableness" for the jury, a more rigorous investigation was not required here based on the superficial notice that Trans Union provided.[40]

The irony is that the CRAs attempt a justification of their deferential procedures by claiming that only the creditor has a substantive investigation duty even though they routinely refuse to forward sufficient, let alone all relevant information to the creditor source.

One argument the CRAs cannot assert is a technological or cost barrier to forwarding the consumer's dispute and supporting documents. First, all three CRAs currently scan and archive the consumer's dispute and documents. There is no greater storage or archive space required. There is also no technological obstacle to forwarding the dispute and documents electronically. Equifax and Trans Union already do so to India and the Philippines. Sending them concurrently to domestic furnishers would not require nearly as much bandwidth and resource devotion. Even beyond these obvious conclusions, we have as well provided the Committee the Proposed Statement of Work drafted by the CRA's E-Oscar vendor, A.T. & T. in 2005. A fix to the E-Oscar system to enable it to include the dispute letters and documents has already been designed. The CRAs need only to implement it.

There are no reasonable privacy objections to forwarding consumer dispute letters to multiple creditors. Each subscriber will have already been the subject of the verification

---

[38] Westra v. Credit Control of Pinellas, 409 F.3d 825 (7th Cir. 2005); Malm v. Household Bank, N.A., No. 03-4340 2004 U.S. Dist. LEXIS 12981 (D. Minn. July 7, 2004).
[39] Westra, 409 F.3d at 827.
[40] Malm v. Household Bank, N.A., No. 03-4340 2004 U.S. Dist. LEXIS 12981 (D. Minn. July 7, 2004).

-29-

provisions of the FCRA to ensure the security of consumer data. Furthermore, the CRAs cannot feign a privacy concern when they would already willingly sell a consumer's entire credit file to a subscriber who provided only a name and address.

### *CRA Reinvestigations are Solely Cost Driven*

The CRA reinvestigation procedures have been implemented and have evolved towards two ends – customer satisfaction and cost. The first motivation is explained by the CRA ambition for greater revenue. The creditor who reports a delinquent account to the CRAs does so in the hope of collecting that debt. And despite the growing profits in credit monitoring services, the CRAs make most of their money from these collecting creditors. For example, we learned in discovery that Trans Union received over $6 million per year from MBNA alone. The CRA has no interest in deferring to a consumer involuntarily captured in a relationship with the agency, when doing so could cause its paying customer to lose collection opportunities and profits.

Equally important is the CRA desire to reduce costs and limit the allocation of resources for functions that do not produce revenue. Until recently, with the move of E-Oscar into a for-profit entity, the reinvestigation function has been seen only as a cost burden, to be minimized and reduced as much as possible. While all three CRAs have taken similar directions, the changes made by Equifax are easiest to measure. Before mid-2004, when Equifax still handled some disputes in-house, its average cost per dispute was $4.67. By late 2004 and into 2005, Equifax was using an outsource vendor in Montego Bay, Jamaica, ACS. Its ACS reinvestigations cost the CRA only $1.08.[41] Now, after the move to DDC in the Philippines, Equifax pays only $.57 per consumer dispute letter, regardless of how many items or accounts are at issue. Trans Union has a different contractual relationship with its outsource vendor. It pays the Indian company a flat $8.00 per man-hour the vendor incurs, but it maintains rigorous production standards the vendor must meet. In addition, nearly all disputes are now conducted by electronic automated means, eliminating the need for human involvement and the expense of a paper enterprise. These dramatic reductions in cost per dispute described above have all come during a period of rising identity theft and fraud disputes.

---

[41] Faile v. Equifax, Deposition of Gary Poch, March 13, 2007.

Litigation discovery has also revealed quota systems used by the CRAs to force employees to process disputes rapidly and without meaningful inquiry. For example, Experian uses a system to measure the number of "converted units" produced by each employee. Each task is assigned a different value. To meet Experian's minimum standards for a pay incentive if processing the most difficult of disputes – fraud and identity theft claims, the employee would have to perform at least 98.25 disputes per day, or 13.1 per hour.[42] The quota minimum at Trans Union before it outsourced its reinvestigation function was between 10 to 14 dispute letters per hour.[43]

This is as much "cost" information as consumers have yet discovered. In fact, in two recent cases, Beck v. Experian and Faile v. Equifax, both CRAs claimed to not maintain budgets, projections or gross cost estimates for their reinvestigation functions. While this claim is incredible, so long as the agencies continue to assert it, they cannot reasonably argue that a substantive and improved reinvestigation process would be cost prohibitive.

### *The 'Red-Herring' of Credit Repair Clinics*

A final retreat for the CRA defense of the shallow investigation system is the industry boogieman, "Credit Repair Clinics." Currently, these are of far less consequence than they may have been five years ago. Still, the CRA concern about credit repair clinics is not entirely unfounded. Pseudo-law firms such as the Lexington Law Group and its protégé deceptively market false promises to obtain the removal of otherwise accurate credit data. However, the CRAs have long ago adapted their procedures to these problem disputes. They each have detailed procedures manuals to train employees and agents to spot these disputes. The credit repair disputes to which the CRAs and the CDIA often refer are generic disputes making a claim such as "This account is inaccurate" with nothing more and are thus easily separated from most disputes.

We do not argue that such an unsupported dispute, without more would require anything other than confirmation from the reporting source. In fact, the FCRA already permits a CRA to refuse to delete or reinvestigate disputed information if the CRA "reasonably determines" a dispute is frivolous or irrelevant.[44] The FTC Staff Commentary states that CRAs must assume

---

[42] Beck v. Experian, et al, Deposition of Kimberly Hughes, June 30, 2005.

[43] Evantash v. Trans Union, et al, Deposition of Eileen Little, January 25, 2003.

[44] 15 U.S.C. § 1681i(a)(3).

that a consumer's dispute is bona fide, unless there is evidence to the contrary.[45]  Such evidence may consist of receipt of letters disputing all information in the file without allegations concerning the specific items in the file.[46]  Other evidence, according to the FTC Staff Commentary, would be a dispute made by a common format suggesting that a "credit repair" organization or similar entity is counseling consumers to dispute all items in their files, regardless of whether the information is known to be accurate.[47]

## REGULATORY ENFORCEMENT HAS BEEN INEFFECTIVE

More than any other factor, the growing permissiveness of the FTC has emboldened the national CRAs and their creditor customers to forgo more cumbersome or substantive FCRA compliance.  As drafted, the statute would appear powerful, and for years earlier it was.  For example, between 1991 and 2000, the FTC vigorously prosecuted violations of the FCRA by the three national CRAs and obtained multiple consent injunctions.  It targeted mixed file problems.  It succeeded in forcing reallocation of resources to the CRAs' reinvestigation responsibilities.  With modest exceptions, as regards Equifax, Trans Union and Experian, the Commission has been largely silent since.

This has been a mistake.  Federal Judges in cases prosecuted by the FTC have injunctive power.  The majority of courts to consider whether individual consumer cases present such remedy have concluded that there is no such injunctive relief.  While I can represent my client to obtain monetary damage, the FTC can force a systemic change for the benefit of all consumers.

The FTC has also failed to challenge CRA and creditor noncompliance when preparing the several reports required by FACTA.  The most important of these, the FTC/FRB Joint Reinvestigation Report concluded hesitantly that there may or may not be a problem with the reinvestigation process.  But it did so by ignoring or failing to affirmatively seek out more substantive contributions from consumers and the organizations that represent them.  Upon receipt of traditional public comments, the FTC staff then worked side by side with the Big 3 CRAs, through the CDIA, to compose and justify the Report analysis and conclusions.

We do not imply any malevolent objective or temperament of the FTC.  In fact, it appears that the Commission's ambitions were fair-minded and well motivated.  However, the regulators

---

[45] *See* FTC Official Staff Commentary § 611 item 11.
[46] FTC Official Staff Commentary § 611 item 11.
[47] *Id.*

-32-

have deferred naively to the National CRAs and the CDIA believing wrongly in their objectivity and institutional integrity. We have produced for the Committee a number of communications between the CDIA and the National CRAs that run the organization, each discussing the FTC/FRB effort and report. Each communication by the FTC staff is documented and discussed. While it is apparent that the FTC was acting and operating under the assumption that the CDIA responses were open and reliable, it is now equally apparent that the opposite was true. On numerous occasions documented in these inside exchanges, the CRAs' General Counsel and Government Relations attorneys instructed the CDIA to withhold, disguise or misstate data to the FTC. For example, when the FTC attorney requested an explanation for and sought data pertaining to the increasingly limited number of E-Oscar dispute codes used, the CDIA and the CRA attorneys did not want the FTC's Tom Kane to learn that 90% of their disputes used the same five generic codes. Instead, they removed the percentages, and added four additional codes that are rarely if ever used to imply deceptively that the CRAs use a broader range of descriptions to convey consumer disputes.

On another occasion, after the FTC had requested current dispute statistics, Equifax's General Counsel and its Chief Privacy Officer wrote between one another:

Mr. Mast (Equifax): "What is the cause in the dramatic change in the data verified percentage? Would seem best to leave [FTC's] Kane with the published older material." Mr. Goerss (Equifax): "I'll look into this. Agree that we need to provide him with the most favorable statistics."

Given the difficulties faced by Mixed File victims, it is also telling that the CRAs avoided an explanation to the FTC about how a Mixed File victim could obtain relief through the reinvestigation process. In drafting the Reinvestigation Report, the FTC requested from the CDIA a sample ACDV form showing a typical consumer dispute. On first draft, the CRAs had prepared an ACDV for a Mixed File inaccuracy. However, more calculating heads prevailed and the ACDV with mixed file implications was replaced with one for a simpler problem – a straight ownership dispute. Experian's attorney stated: "I thought we had discussed going with a different example. This one had a lot of identity issues going on (name, SSN) which may raise a lot of 'what do you do when?' questions. Weren't we going to use a simpler dispute to demonstrate a sample form?"

-33-

These examples are indicative of the way in which Tom Kane's and the FTC's trust was substantively betrayed through its CDIA exchanges.

The FTC also failed to ask tough questions or to demand the CRA manuals and information provided in this written statement. If the CRAs would not provide their procedures, witness testimony or reinvestigation statistics to the FTC on request, it could certainly have looked elsewhere. Instead, the Commission considered the issues raised in NACA's 2003 testimony and solicited from the CRAs a "Rebuttal" to same.

Similarly, the FTC mistakenly allowed its FACTA Accuracy Report to serve as a defense of the industry's Mixed File problems. The FTC concluded that stricter rules on matching identifying information would result in fewer mixed files, but also result in an increase in cases where no matches were found or "no-hits." The FTC noted that some "no-hits" reflect cases where identity theft may be prevented, but remarkably concluded contrary to the generally held views of Identity Theft, Privacy Rights and consumer advocacy groups that in most cases a no-hit does not provide a benefit to consumers.

Finally, the FTC also deferred to the unsupported assertions of the national CRAs when rejecting consumer requests to require the delivery of the actual credit reports used in a credit denial rather than a differently matched product. Credit reports are furnished in electronic form and rarely look much like what the consumer actually receives. In fact, the CRAs use an entirely different algorithm and in one case even a different database to create the "free credit reports" they provide to consumers. The result is that the creditor often receives a materially different report than that provided to the consumer. For example, in 2003 I discussed the case of Teresa Davis. Ms. Davis, then in the Air Force, was denied credit at her local credit union. She was told that it was based on an Equifax credit report and was because of an outstanding collection. She requested a copy of her free Equifax report and was told in same that she had perfect credit. She again applied and again suffered the denial. It was only after three such attempts that she was able to obtain the bank's copy of the report and saw that it contained different data than that provided to her from the CRA. From the perspective of a litigation advocate, this issue is often a difficult one. The CRAs claim to wipe the creditor report from their files after 90 days even though they retain indefinitely every consumer disclosure report they provide to the consumer. When a consumer plaintiff then attempts to use their disclosure as evidence of what the CRA

-34-

would have reported to the third party creditor, the CRA will object and explain that the reports may contain different data.

In FACTA, the Congress asked the FTC to consider the possibility of requiring CRAs to provide to consumers copies of the same reports actually used by the creditor who made a credit denial. This is an especially important issue for consumers such as Mr. Carroll and other mixed file/identity theft victims who might not otherwise understand or learn the real reason for a credit denial. The CRAs fought this, most certainly out of fear of empowering consumer claimants. The argument that they cannot logistically accomplish the archive of such reports is dishonest. All three CRAs maintain all reports they provide to consumers. They maintain at least monthly "snapshots" of a consumer file in one instance as far back as 1989. They retain all dispute documents sent by consumers, all contracts between the agency and their customers, limitless dispute historical data and a wealth of other information far more burdensome than that sought by consumers in these regards. Regardless, as at least two CRAs already retain all such report histories for 90 days, the data is already available to them when a consumer requests their report within 60 days of suffering a credit denial. Had the FTC offered consumers and more knowledgeable consumer groups, or at least required complete procedures data from the CRAs, it could not have reached the conclusion it did.

## RECOMMENDATIONS

Given the range of issues confronting this Congress generally and this Committee specifically, it is our suggestion that the FCRA demands only a small number of immediate improvements, having little cost impact on industry, but offering considerable benefit to consumers. While much has been stated already herein, NACA adopts further the regulatory recommendations of the National Consumer Law Center, with whom we share a public interest.

### Clarify that the FCRA Provides Injunctive Relief.

The first limitation of the FCRA that must be corrected is the failure of Congress to explicitly state that United States District Courts retain their injunctive power in individual FCRA cases. Currently in most jurisdictions, a consumer has no alternative to seeking a monetary judgment as a remedy for a FCRA violation and resulting credit inaccuracies. Even in the most egregious circumstances, most courts have found no judicial means to correct systemic violations. While it is likely that Congress never intended to so divest Federal Courts of their

-35-

injunctive powers, there is judicial confusion that can be corrected with a short addition to the statute expressly acknowledging such a remedy. This would provide a faster and less burdensome remedy for consumers and ease the growing FCRA trial burden in the federal courts.

### *Correct FACTA Scrivener's Error and Continue to Require of Adverse Action Notices.*

The Committee should also correct a second error, this one created in the FACTA codification process. When Congress added a new requirement that mortgage companies provide adverse action notices on counter-offers, it included a provision that stripped the new requirement of a private cause of action. However, because FACTA was drafted with the casual use of the word "Section" to mean this new provision, instead of a clearer "Sub-paragraph" or "Sub-section", some Courts have concluded that the Plain Language of FACTA repealed the private cause of action for every provision in Section 615. This would include the longstanding requirement that a creditor send a denial letter informing a consumer of his right to a free credit report and to make a dispute of inaccurate information in same. Section 615(a).

### *Clarify that the CRA Reinvestigation Duties are Substantive*

Beyond these drafting fixes, NACA believe that either this Congress or the FTC must restate by Statutory amendment, Committee Report, or even informal Regulatory Guidance the following otherwise apparent constructs:

The reinvestigation requirement requires a discretionary inquiry by the CRA into the underlying accuracy of reported data and not merely a determination as to whether or not CRA reporting matches furnisher reporting.

The FCRA's reinvestigation requirement requires the CRA to forward consumer disputes and supporting documents to a furnisher in a manner that provides the furnisher all of the information provided by the Consumer.

### *Require CRAs to Provide Actual Credit Report or Data Used to Take the Adverse Action.*

Congress must consider requiring the CRAs to furnish to consumers requesting their post-denial free report under the FCRA, the same report data provided to the creditor.

### *Enforce the FCRA's Accuracy Requirements to Reduce Mixed Files.*

The FTC must return to its 1990's efforts to regulate the national CRAs in a manner to reduce mixed files.

-36-

### *Enforce the Federal Credit Repair Organizations Act.*

In light of industry concerns about Credit Repair Clinics, the FTC should consider more aggressive investigation and prosecution of violations of the Federal Credit Repair Organizations Act. This is an ambition our organization, NACA, which bars credit repair clinics from its membership, can share with the national CRAs.

**Leonard A. Bennett,** *Consumer Litigation Associates, P.C.,* 12515 Warwick Boulevard, Newport News, VA 23606, Office (757) 930-3660, Facsimile (757) 930-3662. Email lenbennett@clalegal.com

George Mason University School of Law and Economics, Arlington, Virginia: J.D. 1994. Admitted to Virginia State Bar 1994. Admitted to North Carolina State Bar 1995. Admitted to United States Supreme Court, United States Courts of Appeal for the Third and Fourth Circuits, and U.S. District Courts in Virginia, North Carolina, Wisconsin, Illinois and Michigan. Admitted *pro hac vice* in jurisdictions across the country including California, Arizona, South Carolina, Rhode Island, Connecticut, Ohio, Wyoming, Maryland, Alabama, Wisconsin, Pennsylvania and Washington. Member National Association of Consumer Advocates (NACA) and various state Bar Associations.

Speaker and Panelist at numerous state and national seminars and consumer law courses, including regular invitations to speak at the NACA Fair Credit Reporting Act and Auto Fraud conferences, the National Consumer Law Center's Consumer Law conferences; CLE programs for the ABA and various state Bars:

**2007**

- Washington State Bar, Consumer Law CLE, Invited Speaker, July 2007, *Fair       Credit Reporting Act*.

- National Association of Consumer Advocates, *Fair Credit Reporting Act National Conference, Multiple Panels*;

- U.S. Army JAG School, Charlottesville, Virginia, Course Instructor, *Fair       Credit Reporting Act*.

- Georgia State Bar, Consumer Law CLE, Speaker, *Fair Credit Reporting Act*.

**2006**

- Contributing Author, *Fair Credit Reporting Act, Sixth Edition*, National Consumer Law Center

- National Consumer Law Center, National Consumer Rights Conference, Miami, FL, Speaker for Multiple Sessions, *Fair Credit Reporting Act*,

- Texas State Bar, Consumer Law CLE, Speaker, *Federal Claims in Autofraud Litigation*

- Santa Clara University Law School, Course, *Fair Credit Reporting Act*.

- Widener University Law School, Course, *Fair Credit Reporting Act*.

- United States Navy, Navy Legal Services, Norfolk, Virginia, *Auto Fraud*;

**2005**

- Missouri State Bar CLE, Oklahoma City, Oklahoma, *Fair Credit Reporting Act*;

- National Consumer Law Center, National Consumer Rights Conference, Boston, Mass. *Fair Credit Reporting Act Experts Panel*; and *ABC=s of the Fair Credit Reporting Act*.

- National Association of Consumer Advocates, *Fair Credit Reporting Act National Conference*,   New Orleans, Louisiana, *Multiple Panels*;

- United States Navy, Naval Justice School (JAG Training), Newport, Rhode Island, *Consumer Law.*

**2004**

- American Bar Association, Telephone Seminar; A*Changing Faces of Consumer Law@,*

- National Consumer Law Center, National Consumer Rights Conference, Boston, Mass.

- *Fair Credit Reporting Act Experts Panel*; and ABC=*s of the Fair Credit Reporting Act*.

- National Association of Consumer Advocates, *Fair Credit Reporting Act National Conference*, Chicago, Illinois; *Multiple Panels*

- Oklahoma State Bar CLE, Oklahoma City, Oklahoma, *Identity Theft*;

- Virginia State Bar, Telephone Seminar, *Identity Theft.*

- United States Navy, Naval Justice School (JAG Training), Newport, Rhode Island, *Consumer Law*

- United States Navy, Navy Legal Services, Norfolk, Virginia, *Auto Fraud*;

- Virginia State Bar, Richmond and Fairfax, Virginia, *Consumer Protection Law*;

- Michigan State Bar, Consumer Law Section, Ann Arbor, Michigan; *Keynote Speaker.*

Presented NACA=s Congressional Testimony before House Committee on Financial Services, A Fair Credit Reporting Act: How it Functions for Consumers and the Economy@, June 4, 2003, Proposed Amendments to the Federal Fair Credit Reporting Act, http://financialservices.house.gov/media/pdf/060403lb.pdf.

-39-

### United States House of Representatives
### Committee on Financial Services

#### "TRUTH IN TESTIMONY" DISCLOSURE FORM

Clause 2(g) of rule XI of the Rules of the House of Representatives and the Rules of the Committee on Financial Services require the disclosure of the following information. A copy of this form should be attached to your written testimony.

| 1. Name: | 2. Organization or organizations you are representing: |
|---|---|
| Leonard A. Bennett | National Assoc. Consumer Advocates |

**3. Business Address and telephone number:**

12515 Warwick Blvd, Suite 100
Newport News, VA 23606

| 4. Have you received any Federal grants or contracts (including any subgrants and subcontracts) since October 1, 2004 related to the subject on which you have been invited to testify? | 5. Have any of the organizations you are representing received any Federal grants or contracts (including any subgrants and subcontracts) since October 1, 2004 related to the subject on which you have been invited to testify? |
|---|---|
| ☐ Yes ☒ No | ☐ Yes ☒ No |

**6. If you answered "yes" to either Item 4 or 5, please list the source and amount of each grant or contract, and indicate whether the recipient of such grant was you or the organization(s) you are representing. You may list additional grants or contracts on additional sheets.**

**7. Signature:**

*Please attach a copy of this form to your written testimony.*